# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NOAH NAPARSTECK, personal representative for the ESTATE OF XAVIER SIMMONS, DECEASED, | CIVIL ACTION NO. 3:11-CV-1544 |
| Plaintiff, | (JUDGE CAPUTO) |
| v. | |
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE, LUZERNE COUNTY, CHILDREN AND YOUTH SERVICE OF LUZERNE COUNTY, ELIZABETH LOZOSKY-LAYLO, FRANK CASTANO, ROSE GALLAGHER, ANTHONY LUMBIS, VICTOR J. DROSEY, MARSHA ANN BASCO, BERNARD PODCASY and JENNIFER ROGERS, | |
| Defendants. | |

## **MEMORANDUM**

Presently before the Court is Defendants Luzerne County, Children and Youth Services of Luzerne County, Elizabeth Lozosky-Laylo, Frank Castano, and Rose Gallagher's Motion for Reconsideration of the Court's earlier ruling on their Motion to Dismiss. Plaintiff Noah Naparsteck, personal representative for the Estate of Xavier Simmons, seeks to recover for the death of Xavier Simmons while he was subject to a safety plan established by the Defendants. In particular, these Defendants argue that the Court committed a clear error of law in allowing this action to proceed against them upon a special relationship theory under the Fourteenth Amendment. Because this arrangement was sufficiently analogous to foster care, the Court finds no clear error in its previous determination that this claim may survive a motion to dismiss.

## BACKGROUND

By way of review, Plaintiff alleges the following in his Amended Complaint. (Doc. 11). On November 29, 2007, Luzerne County Children and Youth Services ("CYS") were noticed that Tiffany Simmons had left her children with her mother, Sharon Barr, for a two-week period. One of her children, Xavier Simmons, was only six weeks old at that time. CYS knew that Sharon Barr was unable to appropriately care for the children due to mental health issues and that Tiffany Simmons was addicted to illegal drugs. As such, CYS assigned a case worker to the situation on December 4, 2007 and developed a Safety Plan on December 11, 2007.

The Safety Plan removed Xavier's three older siblings from their Mother's custody and placed them with their Father. The Plan left Xavier alone with his Mother, but she was not allowed to remove him from his Grandmother's home. It also specifically provided that Xavier would have no contact with Tiffany Simmons's dangerous boyfriend, Alan Leitzel. The Plan stated that violation of this provision would cause CYS to file for shelter care of Xavier. However, Tiffany Simmons violated the Plan. CYS received numerous reports confirming that Xavier had visited Leitzel's home on December 26, 2007 and that the children were told to lie about their visit. On January 4, 2008, CYS interviewed one of Xavier's siblings and directly confirmed the visit and the order to lie about it. CYS made a determination sometime around then to file a dependency action that would remove Xavier from the care of Tiffany Simmons and Sharon Barr. Although the paperwork was completed January 4, 2008, it was not submitted until January 9. On January 14, 2008, CYS filed a petition with the Court of Common Pleas requesting a determination that Xavier be found dependent. "However, despite the clear terms of the Safety Plan, nothing was done by any

of the Defendants to remove Xavier from his mother and Alan Leitzel from December 26, 2007 when they learned the Safety Plan was violated and January 14, 2008 when a petition was finally filed with the Court of Common Pleas." (*Id.* at p. 6).

Tragically, on January 14, 2008, the same day as the petition was filed in the Court of Common Pleas, Tiffany Simmons again brought Xavier to Leitzel's home. While there, Leitzel violently shook Xavier and hit his head. Xavier suffered severe brain injuries and died the next day as a result.

Plaintiff filed his Complaint in the Court of Common Pleas of Luzerne County on July 21, 2011. The Defendants removed the action on August 19, 2011, and filed a motion to dismiss on August 26, 2011. (Doc. 3). Plaintiff, believing the Defendants' objections could be remedied with the filing of an amended complaint, was granted leave to do so by the Court on October 7, 2011. (Doc. 9). Plaintiff then filed his Amended Complaint, alleging violations of Xavier's Fourteenth Amendment Due Process rights pursuant to 42 U.S.C. § 1983 as well as a survival action pursuant to 20 Pa. Cons. Stat. § 3373 and 42 Pa. Cons. Stat. § 8302, and a wrongful death claim pursuant to 42 Pa. Cons. Stat. § 8301. (Doc. 11).

On January 17, 2012, the Court granted in part and denied in part the moving Defendants' Motion to Dismiss. (Jan. 17, 2012 Order, Doc. 17.) Specifically, the Court dismissed Defendants Anthony Lumbis, Victor J. Drosey, Marsha Ann Basco, Bernard Podcasy, and Jennifer Rogers, as well as Plaintiff's state-law claims since they were barred by the Political Subdivision Tort Claims Act. The Court also dismissed Plaintiff's Fourteenth Amendment claim to the extent it relied upon the state-created danger theory, but allowed it to proceed upon a special relationship theory. It is this determination–that the special relationship theory may apply to the facts of this case–that the moving Defendants argue

was in clear error. The Defendants filed a Motion for Reconsideration on January 31, 2012 arguing that the Court should overturn its earlier determination, or, in the alternative, grant an immediate appeal of the issue. This Motion for Reconsideration has been fully briefed and is ripe for the Court's review.

## **DISCUSSION**

### **I. Legal Standard**

This Motion for Reconsideration arises under Middle District Local Rule 7.10. The procedure for such reconsideration is essentially the same as a motion to alter or amend judgment brought under Rule 59(e), except that it allows for reconsideration of any court order, and is not limited to the entry of judgment. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:06–CV–1105, 2011 WL 4916397, at *2 (M.D. Pa. Oct. 17, 2011) (clarifying that the "difference between a motion for reconsideration under Local Rule 7.10 and a motion to alter or amend judgment under Rule 59(e) is that a motion for reconsideration under Local Rule may be filed in response to any order of the court, not solely after the entry of judgment.").

The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985). A judgment may be altered or amended if the party seeking reconsideration establishes at least one of the following: "(1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café, by Lou-Ann, Inc., v. Quinteros*, 176 F.3d 669, 677

(3d Cir.1999). "A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Ogden v. Keystone Residence*, 226 F. Supp.2d 588, 606 (M.D. Pa. 2002). "[R]econsideration motions may not be used to raise new arguments or present evidence that could have been raised prior to the entry of judgment." *Hill v. Tammac Corp.*, Civ. A. No. 05-1148, 2006 WL 529044, at *2 (M.D. Pa. Mar. 3, 2006). Lastly, the reconsideration is an extraordinary remedy, and should be granted sparingly. *D'Angio v. Borough of Nescopeck*, 56 F. Supp.2d 502, 504 (M.D. Pa. 1999).

## II.  Applicability of the Special Relationship Theory

The Due Process Clause of the Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. However, it imposes no obligation that the government aid or protect its citizens. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 255 (3d Cir. 2007) (citing *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 196 (1989)). It is well established that the protections afforded by the Amendment "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means," specifically the actions of private parties. *DeShaney*, 489 U.S. at 195.

At issue here is the applicability of the special relationship theory to the Plaintiff's case. The special relationship theory is an exception to the general absence of a governmental duty to protect its citizens. It arises where the state "by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for

5

himself, and at the same time fails to provide for his basic human needs." *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003) (quoting *DeShaney*, 489 U.S. at 200)). A special relationship is forged through the state's restraint of an individual that correspondingly exposes him to harm. *Id.* The Supreme Court has explained that this affirmative duty does not arise from a state's "knowledge of the individual's predicament or from its expressions of intent to help him," but of physical and involuntary custody, such as "incarceration, institutionalization, or other similar restraint of personal liberty." *DeShaney*, 489 U.S. at 199-200.

In *DeShaney*, the Supreme Court considered the case of a boy who had been removed from his father's custody amidst allegations of abuse and was beaten into a coma after the state returned him to his father's custody. 489 U.S. at 192-93. The Supreme Court held there that the state had no constitutional duty to protect the child from his father, noting that:

> While the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect [the child].

*Id.* at 201. However, the Supreme Court also opined that "[h]ad the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* at 201 n.9.

In *Nicini v. Morra*, the Third Circuit addressed exactly this potential left open by the

6

Supreme Court in *DeShaney*. 212 F.3d 798 (3d Cir. 2000). *Nicini* concerned a situation where the Division of Youth and Family Services ("DYFS") became involved in the life of a child who had been abused by his father. *Id.* at 800. Though the facts were somewhat convoluted, the child had run away from at least two different foster care homes at which DYFS had placed him. *Id.* at 801. It appears that the child was then admitted to a hospital crisis center, from which he also subsequently ran away. *Id.* at 801-02. By his own volition, the child went to stay with a family where his brother had once stayed during similar turmoil. *Id.* at 802. Though DYFS did not actually place him there, it allowed him to reside there, and he was sexually abused by the father of that family. *Id.* at 802, 804. The Third Circuit expressly held that, as a general matter, "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties. The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983." *Id.* at 808; *see, e.g.*, *S.B. ex rel. D.M. v. City of Phila.*, CIV. 07-768, 2007 WL 3010528, at *2 (E.D. Pa. Oct. 12, 2007) (declining to dismiss claims under the special relationship exception where a girl was placed in foster care and was subsequently sexually abused). Although the facts of *Nicini* did not present an actual instance of foster care, the Third Circuit further determined that the special relationship exception applied to the case as the child "was substantially dependent upon DYFS and that DYFS acquiesced in [the child's] stay." *Id.* at 809. Based on DYFS's acquiescence, the child's situation was held "sufficiently analogous to a foster care placement to fall within the 'special relationship' exception to *DeShaney*." *Id.*

Thus, the question before the Court is whether the situation facing Xavier was sufficiently analogous to foster care. The Amended Complaint does not allege that Xavier

7

was in foster care *per se*. Instead, it alleges that CYS assigned a case worker to monitor Xavier and his siblings after it received notice that they had been left with their maternal grandmother, Sharon Barr, for a two-week period. (Am. Compl. at ¶¶ 9, 12, Doc. 11.) This led to the implementation of a "Safety Plan," which removed Xavier's three siblings from their mother's custody and determined that Xavier would stay with his mother in Barr's home, where he was already residing. (*Id.* at ¶¶ 13, 15-16.) The Safety Plan further established that Xavier's mother could not remove him from the home and that he was to have no contact with Alan Leitzel. (*Id.* at ¶ 18.) Failure to abide by the Safety Plan would result in Xavier's removal to shelter care. (*Id.* at ¶ 16.)

The Court affirms its earlier determination that this arrangement is sufficiently analogous to foster care, and that the Plaintiff has stated a viable claim under the special relationship exception. A fair reading of the Complaint indicates that Xavier was removed from his Mother's physical custody and placed with his maternal grandmother, Sharon Barr. Specifically, it is alleged that CYS determined that Xavier was to remain physically in Barr's home and strictly limited the Mother's ability to remove or transport her child. While the Defendants characterize CYS's action in a far more passive manner, the Court does not agree that "the Safety Plan merely allowed Xavier's legal custody (with his mother) and his residence (at his grandmother's home) to remain unchanged." (Defs.' Br. at 14-15, Doc. 19.) Instead, while the Mother was previously free to take her child where she wished, the Amended Complaint alleges that the Safety Plan intervened in the arrangement between these parties and commanded that Xavier would not be removed from the home of Sharon Barr. Moreover, that Xavier may have wound up in this exact same predicament even without CYS's intervention is irrelevant and counterfactual, because once CYS involved

8

itself in Xavier's situation and sanctioned the status quo arrangement, it forged a special relationship with Xavier.[1] In fact, the Court finds the situation presented in this case is even more analogous to foster care than that of *Nicini*. If sanctioning a child's unilateral decision to reside in a dangerous home is sufficiently akin to foster care for liability, ordering a child to stay in a home is also certainly sufficient.

Finally, to the extent the Defendants cite *Adam C. v. Scranton School District*, 3:CV-07-0532, 2008 WL 4411849 (M.D. Pa. Sept. 23, 2008), that case is unhelpful to their position. There, in pertinent part, Judge Vanaskie determined that *Nicini* did not apply to a foster child placed within a special education institution, where "the Plaintiffs . . . remained Adam's primary caretakers, retained legal custody, approved Adam's education program, *and retained the ability to withdraw Adam from Lourdesmont*, should they have believed his health or safety was is danger." *Id.* at *8 (emphasis added). In other words, placement at Lourdesmont did not create a special relationship with the state since Adam was not compelled to stay and the special relationship exception generally "requires a custodial relationship," *Sanford v. Stiles*, 456 F.3d 298, 304 n.4 (3d Cir. 2006), which has been interpreted as "primarily as setting out a test of physical custody." *Id.* (quoting *Torisky v. Schweiker*, 446 F.3d 438, 445 (3d Cir. 2006)). Here, the Amended Complaint alleges exactly the opposite of the situation in *Adam C.*: nobody, including Xavier's Mother, could

---

[1] The Defendants argue that this interpretation of "analogous to foster care" would "encompass the living situation of virtually every child with whom child welfare authorities became involved: the exception would swallow up the general rule of non-liability." (Defs.' Br. at 15, Doc. 19.) It is not the case that mere involvement will trigger a situation analogous to foster care. However, commanding a child to remain in a home other than its parents' is, as a matter of law, sufficiently analogous to foster care for potential liability to attach under the special relationship exception to the Due Process Clause of the Fourteenth Amendment.

9

remove Xavier from the situation CYS had established. Moreover, *Nicini* explicitly held that foster care met this qualification as a "custodial environment" where children are "unable to seek alternative living arrangements." *Nicini*, 212 F.3d at 808 (quoting *Taylor v. Ledbetter*, 818 F.2d 791, 795 (11th Cir. 1987)). In finding that Xavier's situation was sufficiently analogous to foster care, the Court determines, as it did before, that the special relationship exception applies. This decision was not in clear error and the Defendants' Motion for Reconsideration will be denied on this issue.[2]

## III. Interlocutory Appeal

In the alternative, the Defendants move the Court to vacate its January 17, 2012 Order and to issue a new order stating that the denial of their Motion to Dismiss with respect to the special relationship exception involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the Order may materially advance the ultimate termination of the litigation.

Under 28 U.S.C. § 1291, a court may certify a non-final order for interlocutory appeal if (1) the order "involves a controlling question of law"; (2) "a substantial ground for difference of opinion" exists with regard to the issue involved; and (3) an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *Simon v. United States*, 341 F.3d 193, 199 (3d Cir. 2003). The certification decision rests with the discretion of the district court, and the court may decline to certify an order even

---

[2]Defendants argue that even if the special relationship exception does apply to the instant matter, that the Amended Complaint does not allege the requisite deliberate indifference necessary for this claim to survive. (Defs.' Br. at 17, Doc. 19.) This argument as to culpability was not raised in the Defendants' earlier Motion to Dismiss, and the Court's earlier determination was therefore not in clear error on this point.

10

if the parties have satisfied all elements enumerated in the statute. *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008). The burden to show that such certification is appropriate lies with the moving party "to demonstrate that 'exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after the entry of a final judgment.'" *Id.* (quoting *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 608 (E.D. Pa. 2008)).

The Court does not find that this issue presents extraordinary circumstances for the issuance of an interlocutory appeal order, namely there is no substantial ground for difference of opinion. This potential "exists when controlling authority fails to resolve a pivotal matter." *In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 705 (M.D. Pa. 2009) (citing *Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 599 (E.D. Pa. 2008)). This requires there to be a genuine doubt about which legal standard to apply. *Id.* In particular, "a moving party must demonstrate that the court applied one legal standard and that other courts have substantially differed in applying that standard." *Schnelling v. KPMG LLP*, CIV.A.05-CV3756 (DMC), 2006 WL 1540815, at *3 (D.N.J. May 31, 2006).

The Defendants have not met their burden in proposing an alternate legal standard. And, there is no disagreement that *Nicini* sets out the correct legal standard guiding this analysis. Instead, as evinced above, the Defendants argue that *Nicini* counsels a different outcome than that arrived at in the Court's January 17, 2012 Order. However, where the law is relatively clear, mere disagreement with a court's analysis is not a sufficient ground for such certification. *In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d at 705 (citing *Elec. Mobility Corp. v. Bourns Sensors/Controls*, 87 F. Supp. 2d 394, 398 (D.N.J. 2000)). The Defendants do not specifically address this element, but instead argue that

11

interlocutory appeal could lead to an accelerated, and therefore more efficient, disposition of this matter.  While this may be the case, the Court does not find the requisite substantial ground for difference of opinion.  Therefore, the Defendants' Motion will be denied on as to this interlocutory appeal.

## **CONCLUSION**

Upon review of its January 17, 2012 Memorandum and Order, the Court finds no clear error of law.  The allegations contained within the Amended Complaint present a situation sufficiently analogous to foster care as to survive a motion to dismiss on this cause of action.  Since there is no  substantial ground for difference of opinion on the applicable law to this matter, the Court will also deny the Defendants' request for an interlocutory appeal.  An appropriate Order follows.


| | |
|---|---|
| April 27, 2012<br>Date | /s/ A. Richard Caputo<br>A. Richard Caputo<br>United States District Judge |